IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JAMES T. PARKER,

       Plaintiff,

                                           Civil No. 14-cv-617 MV-GBW

   vs.

DIANNA J. DURAN, in her official
capacity as New Mexico Secretary
of State,

       Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief [Doc. 2].   The Court, having considered the Motion, briefs, relevant law and being otherwise fully informed, finds that the Motion is not well-taken and will be denied.

## BACKGROUND

Plaintiff, James T. Parker, is a registered voter who has no affiliation with a qualified political party, and as such, would be able to appear on a general election ballot for a state or county office only as an "independent candidate."   NMSA 1978, § 1-8-45.   Under the New Mexico Election Code, an independent candidate must comply with certain nomination procedures in order to be placed on a general election ballot.   Specifically, an independent candidate must file, "on the twenty-third day following the primary election of each even-numbered year," a nominating petition with signatures of "a number of voters equal to at least three percent of the

total number of votes cast in the district . . . for governor at the last preceding general election at which a governor was elected."   NMSA 1978, §§ 1-8-51, 1-8-52.

      Different requirements apply to candidates of "major political parties," defined as parties whose candidates received as many as five percent of the total number of votes cast at the last preceding general election for the office of governor, and whose membership totals not less than one-third of one percent of the statewide registered voter file.   NMSA 1978, § 1-7-7. Specifically, before qualifying for a general election ballot, a major political party candidate first must win a primary election, prior to which he or she must file a nominating petition with signatures totaling three percent of the votes cast for all of the party's candidates for governor at the last preceding primary election at which the party's candidate for governor was nominated. NMSA 1978, § 1-8-33.

      Still other requirements apply to candidates of "minor political parties," defined as any "qualified political party" that does not meet the requirements for a major political party.   NMSA 1978, § 1-7-7.   In order to be a "qualified political party," a minor party must submit petition signatures equal to one-half of one percent of the total votes cast at the last general election for the office of governor.   NMSA 1978, § 1-7-2.   Before qualifying for a general election ballot, minor political party candidates are first nominated by their party "in the manner prescribed in [the party's] rules and regulations."   NMSA 1978, § 1-8-1.   The party then must file, on the twenty-third day following the primary election, the name of its candidate, along with a nominating petition containing the signatures of voters totaling not less than one percent of the total number of votes cast for governor at the last preceding general election. NMSA 1978, § 1-8-2.

Plaintiff sought to appear on the November 2014 general election ballot as an independent candidate for the office of Public Education Commissioner District 4.   Accordingly, he filed with the Office of the Secretary of State a declaration of candidacy and a nominating petition on June 26, 2014, which was 23 days after the June 3, 2014 primary election.   The Secretary of State did not find Plaintiff qualified to have his name appear on the general election ballot, because he did not meet the minimum number of signatures on his nominating petition.   Specifically, based on the statutory formula, Plaintiff needed three percent of the total number of votes cast in District 4 for governor at the last preceding general election, or 2,196 signatures, and he had only 1,379 signatures, which was 817 short of the required amount.   If Plaintiff had been seeking a place on the ballot as a minor political party candidate, rather than as an independent candidate, he would have needed to submit only 732 signatures.

Soon thereafter, on July 3, 2014, Plaintiff commenced the instant action by filing a Complaint for Declaratory and Injunctive Relief.   Doc. 1.   In the Complaint, Plaintiff alleges that the New Mexico Election Code, by requiring a prospective independent candidate to obtain more signatures than a prospective minor party candidate in order to qualify for the general election ballot, infringes on his ballot access rights and the rights of independent voters to elect the candidate of their choice, in violation of the First Amendment, and on his right to equal protection of the laws under the Fourteenth Amendment.   On the basis of these violations, Plaintiff seeks: (1) a declaration that, as applied to him, Section 1-8-51(E) of the New Mexico Election Code is unconstitutional; and (2) a preliminary injunction and permanent order enjoining Defendant, New Mexico Secretary of State, to place his name on the 2014 general election ballot as a candidate for the office of Public Education Commissioner District 4.

Simultaneously with the filing of the Complaint, Plaintiff filed a Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief.   Doc. 2.   In the Motion, Plaintiff seeks a temporary restraining order, preliminary injunction and permanent order enjoining Defendant from enforcing the New Mexico Election Code, and requiring Defendant to place Plaintiff on the 2014 general election ballot as a candidate for the office of Public Education Commissioner District 4.

In an Order entered on July 9, 2014, the Court found that Plaintiff had not provided a basis for the Court to grant ex parte, emergency relief, and accordingly, ordered Plaintiff to serve copies on Defendant of the Complaint and the Motion.   The Court also set an expedited briefing schedule on the Motion.   In accordance with that schedule, Defendant filed a response in opposition on July 21, 2014, and Plaintiff filed a reply on July 25, 2014.

## STANDARD

A preliminary injunction "is an extraordinary remedy," and accordingly, "the right to relief must be clear and unequivocal."   *Schrier, M.D. v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted).   To obtain a preliminary injunction, Rule 65 of the Federal Rules of Civil Procedure requires the moving party to establish that four equitable factors weigh in favor of the injunction:   "(1) irreparable injury in the absence of the injunction, (2) the threatened injury to the moving party outweighs the harm to the opposing party resulting from the injunction, (3) the injunction is not adverse to the public interest, and (4) the moving party has a substantial likelihood of success on the merits."   *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009).[1]

---

[1]  The requirements for issuance of a temporary restraining order are similar to those for issuance of a preliminary injunction.  *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 633 F. Supp. 2d 1257, 1267 (D.N.M. 2008).   Unlike a preliminary injunction, if certain circumstances exist, a

"[T]he limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Schrier*, 427 F.3d at 1258 (citation omitted).   For this reason, the Tenth Circuit has identified three types of specifically disfavored preliminary injunctions:   "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Id.* (citation omitted).   "[A]ny preliminary injunction fitting into one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd*, 546 U.S. 418 (2006).   Further, "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at 976.

With regard to the first type of disfavored preliminary injunctions, those that alter the status quo, the Tenth Circuit has explained that the "status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Schrier*, 427 F.3d at 1260.   "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.*   With regard to the second type of disfavored preliminary injunctions, those that are mandatory, the Tenth Circuit has explained that an injunction is mandatory "if the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Id.* at 1261.

temporary restraining order may issue without notice to the opposing party, and is of limited duration. *Id.*

**DISCUSSION**

I.  <u>Plaintiff Requests Injunctive Relief That Falls Into Two of the Disfavored Categories.</u>

Defendant has made a determination that Plaintiff is not qualified to have his name appear on the general election ballot.   Before that determination, Plaintiff's name was not on the ballot. Accordingly, the "status quo" here is that Plaintiff's name is not on the ballot.   Plaintiff asks this Court to alter that status quo by requiring Defendant to place Plaintiff's name on the ballot. Similarly, Plaintiff requests relief that would affirmatively require Defendant to act in a particular way, namely, putting Plaintiff's name on the ballot.   Accordingly, Plaintiff seeks an injunction that is disfavored both because it would alter the status quo, and because it would be mandatory in nature.

II.  <u>Plaintiff Fails to Make the Required Showing to Entitle Him to the Relief He Seeks</u>.

Because the injunction Plaintiff seeks is disfavored, the Court must closely scrutinize Plaintiff's request to assure that the exigencies of this case support the granting of an extraordinary remedy.   In order to prevail on his motion, Plaintiff must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.   Although it is undisputed that Plaintiff will suffer irreparable injury if he is unjustly excluded from the ballot for the office of Public Education Commissioner District 4, Plaintiff nonetheless fails to make a strong showing that he is likely to succeed on the merits of his claim or that the balance of harms weighs in his favor.   Accordingly, Plaintiff fails to establish the equitable factors necessary to entitle him to the injunctive relief he seeks.

   A.   <u>Likelihood of Success on the Merits</u>

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure."   *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).   "The [Supreme] Court

6

has recognized that 'the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.'"   *Populist Party v. Herschler*, 746 F.2d 656, 659 (10th Cir. 1984) (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).   "[B]allot access restrictions 'place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.   Both of these rights, of course, rank among our most precious freedoms." *Id.* (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)).

"It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick*, 504 U.S. at 433.   Rather, "the Court has recognized that States retain the power to regulate their own elections." *Id.*   "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

"Accordingly, the mere fact that a State's system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny." Rather, in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Supreme Court determined that "a more flexible standard applies." *Id.* at 434 (460 U.S. 780, 789 (1983)).   Specifically, under the *Anderson* test, when considering a challenge to a state election law, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to

7

which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson*, 460 U.S. at 789).

In *Burdick*, the Supreme Court elucidated the *Anderson* standard, explaining that the rigorousness of a court's "inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* If a state election scheme imposes "severe restrictions" on the plaintiff's constitutional rights, it may survive only if it is "narrowly drawn to advance a state interest of compelling importance." *Id.* On the other hand, if a state election law provision "imposes only reasonable nondiscriminatory restrictions upon the [plaintiff's] First and Fourteenth Amendment rights . . . , the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

Here, in order to determine whether Plaintiff has made a sufficient showing that he is likely to succeed on the merits, this Court must examine, under the *Anderson* standard, Plaintiff's constitutional challenge to the three percent signature requirement applicable under the New Mexico Election Code to prospective independent candidates. Accordingly, the Court first reviews the "character and magnitude of the asserted injury" to Plaintiff's constitutional rights, considering the burden posed by that signature requirement.

### 1.   Signature Requirement

Plaintiff argues that New Mexico's three percent signature requirement violates the First and Fourteenth Amendments. Both the Tenth Circuit and the Supreme Court, however, have rejected virtually identical constitutional challenges to similar, or more burdensome, signature requirements. Specifically, in *Populist Party*, the Tenth Circuit rejected a constitutional challenge to a provision of the Wyoming Election Code that required an independent candidate to file nominating petitions within 45 to 90 days of the general election, with signatures from at least

five percent of the voters in the previous congressional election.   746 F.2d at 657.   For the
relevant year, 7,964 signatures were required under the five percent requirement to place an
independent candidate on the ballot.   *Id.*   Applying *Anderson*, the Tenth Circuit concluded that
the plaintiffs did not make a sufficient showing of the likelihood of success on the merits, and thus
denied their motion for injunction pending appeal.   The Court based its holding on the fact that
both the Tenth Circuit and the Supreme Court "have upheld election laws restricting ballot access
to independent candidates who file petitions with signatures representing 5% of the voters."   *Id.* at
660 (citing *Jenness v. Fortson*, 403 U.S. 431 (1971); *Arutunoff v. Okla. State Election Bd.*, 687
F.2d 1375 (10th Cir. 1982)).   New Mexico's three percent signature requirement clearly is less
burdensome than Wyoming's five percent signature requirement upheld as constitutional in
*Populist Party*.

Similarly, the Supreme Court has upheld signature requirements more restrictive than New
Mexico's three percent requirement.   *See Am. Party of Tex. v. White*, 415 U.S. 767, 788-89 (1974)
(upholding Texas's signature thresholds of three and five percent for local independent
candidates); *Storer*, 415 U.S. at 740 (finding that California's five percent signature was not per se
unconstitutional); *Jenness*, 403 U.S. at 442 (upholding Georgia's five percent requirement).
Under "this long line of precedent," the Court concludes that New Mexico's three-percent
signature requirement is a reasonable, nondiscriminatory restriction on Plaintiff's constitutional
rights.   *See Swanson, III v. Worley*, 490 F.3d 894 (11th Cir. 2007) (finding to be a "reasonable and
nondiscriminatory restriction" Alabama's requirement, virtually identical to the one here, that
independent and minority candidates obtain signatures of three percent of the electors who cast
votes for governor in the last election).

This conclusion is further supported by the fact that New Mexico's Election Code "imposes no suffocating restrictions whatever upon the free circulation of nominating petitions." *Jenness*, 403 U.S. at 438.   There are no rules restricting voters, based on party affiliation, from signing the petition of an independent candidate, or restricting voters who have already voted in a primary from signing an independent candidate's petition.   Independent candidates may seek signatures from voters who have already signed other petitions, with only one caveat:   a voter may not sign a petition for an independent candidate if he or she has already signed a petition for another independent candidate for the same office.   NMSA 1978, § 1-8-51(F).   Notably, while there is a deadline for collecting signatures, there does not appear to be a required start date or limited time period for collecting signatures.   Finally, because the deadline for collecting signatures is during June, 23 days *after* the primary election has been held, independent candidates have the benefit of petitioning when the weather is warm and the days are long, and voters are more generally engaged in the political process.   *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) ("Deadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized."); *Libertarian Party of Wash. v. Monroe*, 31 F.3d 759, 762 (9th Cir. 1994) (describing *Anderson* as recognizing the difficulty for independent candidates to gather required signatures before an early filing date because of "voter apathy and the difficulty in attracting media coverage at such an early date, because of adverse winter weather during the time signatures had to be collected, and because the real issues in the campaign remained unclear when campaigning for the primary elections had not yet begun").   All of these "alleviating factors . . . ameliorate any burden on [Plaintiff's] constitutional rights."   *Swanson, III*, 490 F.3d at 904.

10

Further, while Plaintiff was required to gather more signatures than a minor party candidate would have been required to gather, this alone does not render the signature requirement applicable to him a severe burden on his constitutional rights.   Plaintiff, as a prospective independent candidate, is not similarly situated to a prospective minor party candidate seeking to be included on a general election ballot.   The process by which a minor party candidate may qualify to be included on a general election ballot is distinct from the process applicable to an independent candidate.   Specifically, in order to present a candidate for the general election ballot, a minor party first must qualify as a political party by submitting a petition with signatures equal to one-half of one percent of the total votes cast at the last general election for the office of governor.   A candidate then must go through the nomination process of its party, and after nomination, file a petition containing signatures from at least one percent of the voters who voted for governor in the last election.

A minor party candidate thus must meet requirements to which an independent candidate is not subjected, before he or she even reaches the stage of gathering signatures to qualify for a place on a general election ballot.   In light of these additional restrictions, it "cannot be argued that [minor] party candidates face a lighter burden in having their names placed on the ballot." *Hagelin for President Comm. of Kansas v. Graves*, 25 F.3d 956, 960 (10th Cir. 1994).   Viewed in the context of its full election scheme, the fact that New Mexico requires more signatures from independent candidates than it does from minor party candidates does not render the independent candidate signature requirement unreasonable or discriminatory.   *See Arutunoff*, 687 F.2d at 1380 ("[T]he states need not treat minor political parties and independent candidates identically in order for state laws to withstand constitutional challenge."); *see also Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 258 (6th Cir. 1998) (affirming district court's finding that disparity

between 1,807 signature requirement for unaffiliated candidates and 50 signature requirement for party candidates in primary election was constitutional); *Kuntz v. N.Y. State Senate*, 113 F.3d 326, 328 (2d Cir. 1997) (upholding disparity between 3,500 signatures needed for independent candidate ballot access and 625 signatures needed for party candidate); *Nader v. Connor*, 332 F. Supp. 2d 982, 991 (W.D. Tex. 2004) (holding Texas's election laws to be reasonable in drawing a distinction between the signature requirements imposed on independent candidates and minor party candidates), *aff'd*, 388 F.3d 137 (5th Cir. 2004).

Nor does a "historical inquiry" reveal that the three percent signature requirement has been a severe burden on independent candidates in Plaintiff's position.   Doc. 2 at 6.   While "past experience" is a "helpful, if not always an unerring, guide" in determining the severity of a ballot access restriction, *see Storer*, 415 U.S. at 742, here, Plaintiff has presented no evidence that an independent candidate has even sought, much less sought and failed to gain, access in a race for the office of Public Education Commissioner, or for any other office in New Mexico local or state government.   Indeed, Plaintiff admits that the Public Education Commission "has had a difficult time attracting candidates in general, and for District 4 in particular," and specifically notes that "until this year not one candidate" – neither of a major party, a minor party, nor of no party affiliation – "had ever appeared on the ballot for the District 4 seat."   Doc. 2 at 4-5.   This "past experience," while perhaps demonstrating a lack of interest in the office of Public Education Commissioner, sheds no light on the relevant issue of whether "a reasonably diligent independent candidate [could] be expected to satisfy the signature requirements" imposed by the New Mexico Election Code.   *Storer*, 415 U.S. at 472.   Moreover, while Plaintiff states that New Mexico has had "fewer independent and minor party candidates on their general elections ballots" than almost every other state, Plaintiff fails to put that statement into context.   Doc. 2 at 6.   Specifically,

Plaintiff omits the fact, admitted by his own expert, that New Mexico actually has fewer majority party candidates on its general election ballots than "almost any other state" as well.[2]   Doc. 1-2 ¶ 8.

Finally, *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2007), cited by Plaintiff in support of his constitutional challenge, does not alter the Court's analysis, as it is distinguishable on its facts and thus not persuasive here.   In *Lee*, the plaintiff challenged provisions of Illinois law that required an independent candidate for the General Assembly to qualify for the general election ballot by collecting, within the 90 days immediately preceding the filing deadline, the signatures of registered voters in his or her legislative district equal to at least 10 percent of the number of votes cast in that district during the last general election, and filing a nominating petition by the same deadline that applied to partisan candidates:   92 days before the primary, or 323 days before the general election.   *Id.* at 765.   The law further disqualified anyone who signed an independent's petition from voting in the primary election.   *Id.*   The Court held:

> [T]he ballot access restrictions Illinois places on independent General Assembly candidates – the early filing deadline and the ten percent signature requirement, together with the corresponding restriction disqualifying an independent candidate's petition signers from voting in the primary – combine to severely burden Lee's First and Fourteenth Amendment rights as a candidate and voter.

*Id.* at 772.   In reaching this holding, the Court noted that, in comparison to every other state in the nation, "Illinois's deadline for independent legislative candidates to file signed nominating petitions – 323 days before the general election – was by far the earliest for the 2004 election," and

---

[2] Nor does the Court find compelling Plaintiff's expert's statement that New Mexico "is approximately tied with Alabama and Montana for having the highest percentage requirement." Doc. 1-2 ¶ 5.   The "legislative choices of other states" are not relevant "because a court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature."   *Swanson, III*, 490 F.3d at 910 (citation omitted).   "Further, the Supreme Court has upheld a broad array of election schemes," and the inquiry before this Court is confined to whether New Mexico's "election scheme is constitutional, not whether [New Mexico's] scheme is the best relative to other states."   *Id.*

noted that 39 states "set their filing deadlines at June 1 of the election year or later."   *Id.* at 766.

The Court also noted that, when compared to the other 28 states that required independent

candidates to collect signatures from registered voters equal to a specified percentage of the votes

cast in the previous general election, "Illinois's 10% signature requirement stands alone:   it is the

only one that exceeds 5%."   *Id.*   Illinois thus had "the distinction of having both the most

demanding signature collection requirement *and* by far the earliest filing deadline of all 50 states."

*Id.* at 769.

Plaintiff cannot similarly ascribe such distinction to New Mexico's Election Code.   While

Illinois required an independent candidate to gather signatures of 10 percent of voters, New

Mexico requires signatures of only three percent of voters, an amount repeatedly upheld as

constitutional by the Supreme Court and the Tenth Circuit.   Further, while Illinois set an early

filing deadline of 92 days before the primary, New Mexico sets its deadline at 23 days after the

primary, in keeping with the "June 1 or later" deadline noted in *Lee* as being the standard in 39

states, and does not appear to limit the time during which signatures can be gathered before the

deadline.   Finally, while Illinois penalizes voters who sign nominating petitions for independent

candidates by prohibiting them from voting in the primary election, New Mexico has no such

prohibition.   Because each of the provisions at issue in *Lee* thus was considerably more restrictive

than is the sole signature requirement at issue here, the Court's holding in *Lee* that the Illinois

provisions, in combination, severely burdened Plaintiff's constitution rights is inapposite.

Nothing in *Lee* suggests that New Mexico's three percent signature requirement is anything but a

reasonable, nondiscriminatory restriction on Plaintiff's constitutional rights.

2.      State Interests

Defendant argues that the State's "important regulatory interests" in running orderly elections and avoiding voter confusion, which interests are served by requiring candidates to demonstrate a "modicum of support" before being placed on a general election ballot, justify the three percent signature requirement applicable to Plaintiff.   Doc. 9 at 8-10.   Because the Court has determined that this restriction is reasonable and nondiscriminatory, *Anderson* dictates that it is subject to a "less exacting review."   *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).   Under *Anderson*, the Court concludes that Defendant's stated interests are sufficient to justify the three percent signature requirement.

The Supreme Court has clearly held that "States may condition access to the general election ballot by [an] independent candidate upon a showing of a modicum of support among the potential voters for the office."   *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). First, in *Jenness*, the Supreme Court expressly recognized "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot – the interest, if no other, in avoiding confusion, deception and even frustration of the democratic process at the general election."   403 U.S. at 442. Thereafter, in *Socialist Workers Party*, the Supreme Court "reaffirm[ed] th[e] principle," "establish[ed] with unmistakable clarity" in *Jenness*, "that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot."   479 U.S. at 194.

Plaintiff concedes that New Mexico has legitimate interests in preventing ballot overcrowding and requiring some preliminary showing of a modicum of support for candidates for office.   Nonetheless, Plaintiff argues that there is no evidence that such concerns exist here.   In

15

support of that argument, Plaintiff points to the fact that, if the injunction he seeks is granted, there

will be only two candidates on the ballot for the position he seeks.   Additionally, Plaintiff asserts

that he has already shown a modicum of support by submitting petitions from over one percent of

the voters in his district, which is the number of signatures a minor party candidate would have

been required to submit.   According to Plaintiff, the three percent signature requirement thus is

not necessary to promote New Mexico's important regulatory interests.

      Plaintiff's argument "misapprehends the proper test for reasonable, nondiscriminatory

regulations.   Because any percentage requirement . . . is necessarily arbitrary and impossible to

defend . . . as either compelled or least drastic, the test is not whether the regulations are necessary

but whether they rationally serve important state interests."   *Swanson, III*, 490 F.3d at 912

(citation omitted).   Indeed, the Supreme Court has "never required a State to make a

particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of

frivolous candidacies prior to the imposition of reasonable restrictions on ballot access."

*Socialist Workers Party*, 479 U.S. at 194-95.   Because state legislatures "should be permitted to

respond to potential deficiencies in the electoral process with foresight rather than retroactively,"

*id.* at 195, Defendant is not required to present evidence in support of its professed and

undisputedly legitimate interests.

      Further, the Supreme Court has made clear that the "preliminary showing" that states may

demand need not be the same for independent candidates as for party-sponsored candidates.   *See*

*Jenness*, 403 U.S. at 442 (upholding the differential treatment of party-sponsored and independent

candidates).   As discussed above, an independent candidate is not similarly situated to a minor

party candidate seeking to be included on a general election ballot.   In particular, because a minor

party candidate goes through a more rigorous process to be included on the ballot before the

16

gathering of signatures on a nominating petition even begins, a minor party candidate "has already demonstrated a substantial level of support, unlike independent candidates."   *Kuntz*, 113 F.3d at 328.   Accordingly, comparing the signature requirements imposed on independent candidates with those imposed on minor party candidates "is comparing apples to oranges, and the comparison . . . does not fit into an equal protection analysis."   *Miller*, 141 F.3d at 258.

Indeed, the Tenth Circuit specifically rejected an equal protection challenge to disparate signature requirements imposed upon independent and minor political parties, noting that "[a] political group becoming a recognized political party and offering to the electorate a slate of candidates is far different than one individual becoming an independent candidate to run for a particular office."   *Arutunoff*, 687 F.2d at 1380.   The Court further noted that, as stated in *Storer*, "the political party and the independent candidate approaches to political activity are entirely different."   *Id.* (quoting *Storer*, 415 U.S. at 745).   For this reason, the Court held that "states need not treat minor political parties and independent candidates identically in order for state laws to withstand constitutional challenge."   *Id.*

Here, Plaintiff, as an independent candidate, was not subject to the same process to which a minor party candidate would have been subjected in order to appear on the general election ballot. In particular, before gathering signatures for his nominating petition, Plaintiff had not demonstrated any "modicum of support," as a minority party candidate would have done. Accordingly, the imposition of a more stringent signature requirement on independent candidates rationally serves the State's legitimate interest in ensuring that independent candidates have a modicum of support before including them on a general election ballot.

The Court thus holds that New Mexico has articulated important regulatory interests justifying its reasonable, nondiscriminatory ballot access restriction.   It follows that, under

*Anderson*, Plaintiff has failed to make any showing, much less make a strong showing, that he is likely to succeed on the merits of his constitutional challenge to the three percent signature requirement applicable under the New Mexico Election Code to prospective independent candidates.

       B.    <u>Balance of the Harms</u>

Plaintiff asserts that the threatened injury to him outweighs "any conceivable damage" to Defendant, because if an injunction is not granted, Plaintiff will not be able to appear on the ballot, and will not be able to seek the District 4 seat for four years, which "will directly and unconstitutionally affect [Plaintiff's] right to advance his political beliefs as a candidate, and will also unconstitutionally deprive the qualified voters in PEC District 4, regardless of their persuasion, from effectively casting their votes."   Doc. 2 at 10.   Plaintiff's argument rests on the premise that he is likely to succeed on his claim that his exclusion from the ballot violates his First and Fourteenth Amendment rights.   As discussed above, however, the Court has rejected this argument.   Accordingly, while it is true that the denial of an injunction will mean that Plaintiff will be unable to run for the office of Public Education Commissioner in 2014, that harm is unlikely to have any constitutional dimension.

On the other hand, Defendant asserts that it will be harmed if an injunction is granted because it will be forced to ignore the application of its own law and include a candidate on the ballot who, pursuant to that law, does not qualify for such inclusion.   Doc. 9 at 11.   Defendant notes that such harm would be irreparable if Plaintiff is included on the ballot and wins, and thereafter, the Court makes a final determination that, in fact, the challenged provisions of the New Mexico Election Code are constitutional and applicable to Plaintiff.   *Id.* at 13.

Given the relative magnitude of these competing harms, the Court finds that Plaintiff has not made a strong showing that the balance of harms weighs in his favor.   While excluding Plaintiff from the ballot likely carries no constitutional implications, including him on the ballot would contravene state law that, at this juncture, appears to pass constitutional muster.   Based on the Court's conclusions herein, the potential irreparable harm to Defendant in including Plaintiff on the ballot thus outweighs the harm to Plaintiff in being excluded from the ballot.

C.      Public Interest

Plaintiff argues that his requested injunction is not adverse to the public interest because it "will remedy an immediate violation of [his] constitutional rights and the rights of the voters in PEC District 4."   Doc. 2 at 11.   Again, this argument rests on the premise that he is likely to succeed on his claim that his exclusion from the ballot violates his First and Fourteenth Amendment rights.   As discussed above, however, the Court has rejected this argument, and found instead that New Mexico's three percent signature requirement appears to pass constitutional muster.   Under these circumstances, it would be adverse to the public interest to grant Plaintiff's requested injunction, thereby effectively ordering Defendant to violate New Mexico's legitimate ballot access law.

**CONCLUSION**

Plaintiff seeks an injunction that would alter the status quo and is mandatory in nature. Although it is undisputed that Plaintiff will suffer irreparable injury if his injunction is not granted, Plaintiff has not made a strong showing either that he is likely to succeed on the merits of his claims or that the balance of harms weighs in his favor, or a showing that an injunction would not be adverse to the public interest.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Temporary Restraining

Order and Preliminary and Permanent Injunctive Relief [Doc. 2] is denied.


DATED this 7th day of August, 2014.

_____
MARTHA VAZQUEZ
United States District Judge